IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-02411-PAB-CBS

ROSEMARY NIKKEL,

      Plaintiff,

v.

WAKEFIELD & ASSOCIATES, INC.,

      Defendant.

---

## ORDER

---

This matter is before the Court on the Motion for Summary Judgment [Docket No. 36] filed by defendant Wakefield and Associates, Inc. ("Wakefield"). The motion is fully briefed and ripe for disposition.

## I. BACKGROUND[1]

This case arises out of Wakefield's attempts to collect unpaid medical bills that plaintiff Rosemary Nikkel owed to Children's Hospital ("Children's") in Aurora, Colorado. In her amended complaint, Ms. Nikkel alleges that Wakefield, in its attempt to collect such bills, violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. *See* Docket No. 10. Ms. Nikkel seeks an award of statutory damages and attorneys' fees and costs for Wakefield's alleged violations of the FDCPA.[2]

---

[1] The following facts, unless otherwise indicated, are not in dispute.

[2] In the Final Pretrial Order [Docket No. 43], Ms. Nikkel advised that she no longer seeks an award for actual damages. Docket No. 43 at 3; *see United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1235 (10th Cir. 2000) (finding that the final pretrial order supersedes the complaint and is the operative

Sometime before 2009, Ms. Nikkel incurred an obligation to repay Children's for $1496.00 in unpaid medical bills.[3]  Docket No. 36-1 at 1, ¶ 5.  The medical bills stemmed from in-patient treatment her son received at Children's.  Docket No. 36-4 at 8 (Nikkel Dep. 47:11-23).  When Ms. Nikkel received Children's bill, she refused to pay. *Id.* at 9 (Nikkel Dep. 48:16-23); *id.* at 10 (Nikkel Dep. 54:8-21).  On March 17, 2009, Children's assigned the collection of Ms. Nikkel's unpaid medical bills to Wakefield.[4] Docket No. 36-1 at 1, ¶ 5.  The billing statement Children's provided to Wakefield identified Ms. Nikkel's address as "4613 Estes St., Wheat Ridge, CO 80033" (the "Wheat Ridge address").  Docket No. 36-5.

Ryan Boettcher, vice president of operations at Wakefield, testified as Wakefield's Rule 30(b)(6) witness with respect to Wakefield's collection activities. According to Mr. Boettcher, Wakefield uses a computer system known as the "Cyclone software" to perform its collection activities.  Docket No. 36-2 at 3 (Rule 30(b)(6) Dep. 28:3-23).  Once a debt is assigned to Wakefield, every action taken on that account is represented in the "account notes" through unique identifiers generated either by the

---

pleading).

[3]Ms. Nikkel's obligation to repay Children's meets the definition of the term "debt" as that term is defined in the FDCPA.  15 U.S.C. § 1692a(5) ("The term 'debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which . . . services which are the subject of the transaction are primarily for personal, family, or household purposes").

[4]Wakefield is a company that uses instrumentalities of commerce for the principal purpose of collecting debts owed by consumers.  As such, Wakefield qualifies as a "debt collector" as that term is defined in the FDCPA.  15 U.S.C. § 1692a(6). ("The term 'debt collector' means any person who uses any instrumentality of interstate commerce . . . the principal purpose of which is the collection of any debts").

2

Cyclone software or by collection agents.[5]  *See* Docket No. 36-3.  Each unique identifier represents a specific action taken in connection with the account.  Docket No. 36-2 at 2 (Rule 30(b)(6) Dep. 27:12-14).

With respect to the Validation of Debt Notices required by the FDCPA, Mr. Boettcher testified that, once Wakefield is assigned an account, the Cyclone software generates an Initial Demand Letter that contains all of the statutorily required disclosures.  *Id*. at 5-6 (Rule 30(b)(6) Dep. 30:11-31:13).  After the Cyclone software generates the Initial Demand Letter, the letter is sent to a third party letter vendor, DANTOM Systems, Inc. ("DANTOM"), located in Dearborn, Michigan.  DANTOM then mails the Initial Demand Letter to the consumers and, once it is confirmed that the letters are mailed, the Cyclone software generates a unique identifier indicating the date and time the letter was sent.  *Id*. at 5 (Rule 30(b)(6) Dep. 30:21-25).  However, neither DANTOM nor Wakefield keeps paper or electronic copies of the mailed Initial Demand Letters.  *Id*. (Rule 30(b)(6) Dep. 30:2-13); *id*. at 7 (Rule 30(b)(6) Dep. 33:1-10).  The Cyclone system generates unique identifiers signifying if an Initial Demand Letter has been returned as undeliverable.  *Id*. at 9 (Rule 30(b)(6) Dep. 42:1-7).

In this case, Wakefield alleges that it mailed an Initial Demand Letter to Ms. Nikkel's Wheat Ridge address on March 17, 2009.  Docket No. 36-2 at 4 (Rule 30(b)(6)

---

[5]In the account notes, Docket No. 36-3, every event disclosed is either entered by the Cyclone software which is denoted with a "99," Docket No. 36-2 at 3 (Rule 30(b)(6) 28:4-6), or by collection agents represented by their initials.  *Id*. at 12 (Rule 30(b)(6) Dep. 56:9-10); Docket No. 38-1 at 3 (Rule 30(b)(6) Dep. 65:10-16).

Dep. 29:5-15).[6]   Wakefield claims that the Initial Demand Letter sent to Ms. Nikkel on March 17, 2009 contained all of the disclosures required by the FDCPA, Docket No. 36-1 at 1, ¶ 6, and that the letter was not returned as undeliverable.[7]   Docket No. 36-2 at 11 (Rule 30(b)(6) Dep. 47:1-4).   Wakefield, however, does not have a copy of the letter sent to Ms. Nikkel.  *Id.* at 5 (Rule 30(b)(6) Dep. 30:2-6); *id.* at 7 (Rule 30(b)(6) Dep. 33:1-6).

In her deposition, Ms. Nikkel alleges that she never received Wakefield's Initial Demand Letter of March 17, 2009, Docket No. 36-4 at 17 (Nikkel Dep. 87:20-23), not having lived at the Wheat Ridge address for several years prior to March 17, 2009.  *Id.* at 2 (Nikkel Dep. 23:23-25).

On March 15, 2010, DANTOM advised Wakefield that Ms. Nikkel had moved from the Wheat Ridge address.  Docket No. 38-1 at 2 (Rule 30(b)(6) Dep. 64:9-14). Based on his interpretation of the account notes, Mr. Boettcher alleges that DANTOM told Wakefield's collection agent "JB" that Ms. Nikkel had not lived at the Wheat Ridge address for "three-quarters of a year."[8]  *Id.* (Rule 30(b)(6) Dep. 64:22-24); *see* Docket

---

[6]On May 18, 2009, the Cyclone software generated a second demand letter, presumably mailed to Ms. Nikkel's Wheat Ridge address.  Docket No. 36-2 at 8 (Rule 30(b)(6) Dep. 41:14-25).

[7]Wakefield alleges that the Wheat Ridge address on the Children's billing statement was also the address identified in Accurrant, a database of public and non-public consumer information.  Docket No. 36-2 at 11 (Rule 30(b)(6) Dep. 47:8-11).

[8]The account note states as follows: "0609DL 03/15/10 11:51 JR #02 N/S PER p/s BD ADD DFNDNT HS NT LVD THR FR 3/4 YRS PR CRRNT TNT UPN INFO BLV DFNDNTS NW RSD @ 6849 RENO DR. ARVADA CO 80002."  Docket No. 36-3 at 2. The parties dispute whether the notation "3/4 YRS" stands for "three-quarters of a year" or "three to four years."

4

No. 36-3 at 2 (note 0609DL).  Ms. Nikkel disputes this fact and claims instead that the account note reflects that she did not live at the Wheat Ridge address for three to four years.

On April 1, 2010, after Wakefield learned that Ms. Nikkel did not reside at the Wheat Ridge address, it initiated an action in the County Court for Jefferson County, Colorado, seeking a declaration that it was entitled to a judgment in the amount of $1496.00 in principal and $243.51 in interest as the assignee of the Children's account. Docket No. 36-7 at 4.  Wakefield applied an eight percent per annum interest rate to Ms. Nikkel's Children's account allegedly pursuant to Colorado law.  Docket No. 36-2 at 23 (Rule 30(b)(6) Dep. 90:1-8); *id*. at 24 (Rule 30(b)(6) Dep. 91:17-18).

On April 4, 2010, Wakefield served Ms. Nikkel with the state court complaint and summons.  Docket No. 36-4 at 18-19 (Nikkel Dep. 95:25-96:5); Docket No. 36-8.  The complaint and summons provided were accompanied by a "cover letter" that advised Ms. Nikkel to contact Wakefield "immediately" to avoid further litigation costs.  Docket No. 37-3 at 2.  Ms. Nikkel's initial appearance for the state court lawsuit was scheduled for May 17, 2010.  Docket No. 36-4 at 23 (Nikkel Dep. 103:13-17).

On April 22, 2010, Ms. Nikkel contacted Wakefield and spoke with a collection agent in order to settle the matter and avoid garnishment of her wages.  Docket No. 36-4 at 19 (Nikkel Dep. 96:18-23); *id*. at 20 (Nikkel Dep. 97:7-9).  During the April 22, 2010 phone call, Ms. Nikkel discussed a payment plan with collection agent "JB."  Docket No. 36-2 at 16 (Rule 30(b)(6) Dep. 72:14-19).  JB told Ms. Nikkel that, to avoid litigation, she would have to pay the principal amount on the account in addition to interest and court costs.  *Id*. at 17 (Rule 30(b)(6) Dep. 73:15-22); Docket No. 36-3 at 2 (note 06u89p).  JB

5

knew the amount of interest to apply to Ms. Nikkel's account because the Cyclone

system has a program that computes applicable interest.  Docket No. 36-2 at 21 (Rule

30(b)(6) 88:18-20).  Although JB first requested that Ms. Nikkel provide a down

payment of $500 and continue with monthly payments of $250 thereafter, Docket No.

36-4 at 27 (Nikkel Dep. 115:8-9), Ms. Nikkel was able to reach an agreement wherein

Wakefield would receive a $300 down payment with $100 monthly payments until the

debt was satisfied.  *Id*. at 33-34 (Nikkel Dep. 127:25-128:5); Docket No. 36-2 at 16

(Rule 30(b)(6) Dep. 73:19-22).

      According to the terms of the agreement discussed on April 22, 2010, Ms. Nikkel

would pay $1496.00 in principal, $246.45 in interest, and $153.85 for court costs for a

total amount of $1,896.30.  *See* Docket No. 36-10.  In addition, the agreement included

two clauses[9] wherein Ms. Nikkel agreed to waive all legal claims against Wakefield and

agreed to an attorneys' fees provision to settle any future disputes.  *See id*.

      During the April 22, 2010 phone conversation, JB did not discuss the waiver

provision with Ms. Nikkel.  Docket No. 37-2 at 3-5 (Rule 30(b)(6) Dep. 106:19-25,

---

     [9]The Agreement states, in pertinent part:

4.  Defendant(s) waives any and all claims, counterclaims or causes of action including but not limited to actions under the Colorado Fair Debt Collection Practices Act, the Federal Credit Reporting Act, and the Federal Fair Debt Collections Practices Act, as well as any other administrative causes of action.

5.  **Attorney Fees**: If any action is brought because of any breach of, or to enforce or interpret any of the provisions of this Agreement, the party(s) prevailing in such action shall be entitled to recover from the opposing party(s) reasonable attorney fees and court costs incurred in connection with such action, the amount of which shall be fixed by the court and made a part of any judgment rendered.

Docket No. 36-10 at 1-2.

109:25-110:11).  According to Mr. Boettcher, Wakefield's collection agents cannot counsel consumers on waivers or other legal matters.  *Id.* at 4-5 (Rule 30(b)(6) Dep. 110:19-111:3); *id.* at 5 (Rule 30(b)(6) Dep. 111:21-25).

On April 26, 2010, Wakefield sent Ms. Nikkel the settlement agreement, Docket No. 36-2 at 18 (Rule 30(b)(6) Dep. 76:8-10), which she received on or around April 28, 2010, approximately two weeks before the scheduled date for her initial appearance in the state court action.  Docket No. 36-4 at 35-36 (Nikkel Dep. 129:13-17, 132:21-24). The settlement agreement required Ms. Nikkel to provide Wakefield with a down payment by May 14, 2010.  *Id.* at 41 (Nikkel Dep. 145:22-25).

Ms. Nikkel was not represented by counsel when she signed the settlement agreement and Wakefield did not advise her to contact an attorney before signing the settlement agreement.  Docket No. 37-1 at 30 (Nikkel Dep. 312:11-15).  Ms. Nikkel stated that her main concern was to avoid going to court and that she would have "signed anything to keep from going [to] court."  Docket No. 36-4 at 34 (Nikkel Dep. 128:19-25).  She testified that she felt rushed before signing the agreement, Docket No. 37-1 at 34 (Nikkel Dep. 316:13-16), and that, when she signed the waiver, she had never heard of the FDCPA or the Colorado Fair Debt Collection Practice Act.  Docket No. 36-4 at 39 (Nikkel Dep. 143:8-10).  In addition, she did not know that by signing the waiver she would be forfeiting her rights under the FDCPA, the Colorado Fair Debt Collection Practices Act, and the Federal Fair Credit Reporting Act.  Docket No. 37-1 at 28-29 (Nikkel Dep. 310:25-311:5).  Given that she had never heard of these statutes, she testified that she was not aware that by signing the settlement agreement she would not be able to bring FDCPA claims in the future.  Docket No. 37-1 at 31 (Nikkel

7

Dep. 313:20-25).  Furthermore, Ms. Nikkel testified that she knew if she did not sign the settlement agreement, Wakefield would secure a judgment in the state court action. Docket No. 36-4 at 38 (Nikkel Dep. 139:14-16).

On May 14, 2010, Ms. Nikkel wrote a check for $300 pursuant to the terms of the settlement agreement, Docket No. 36-12; Docket No. 36-4 at 42 (Nikkel Dep. 148:8-21), and mailed the check and the agreement to Wakefield on May 17, 2010.  *Id.* at 43 (Nikkel Dep. 149:6-9).  Ms. Nikkel did not appear at the initial hearing for the state court action because she thought that by sending the agreement her appearance in court was not necessary.  *Id*. (Nikkel Dep. 149:12-14).  Ms. Nikkel testified that she did not realize that, even though she resolved the matter with the settlement agreement, she was still required to go to court.  *Id.* at 49 (Nikkel Dep. 167:20-25).

On May 19, 2010, Wakefield received the $300 check along with the signed agreement from Ms. Nikkel, Docket No. 36-2 at 20 (Rule 30(b)(6) Dep. 79:10-14), and filed the agreement in state court on the same day.  Docket No. 36-11; Docket No. 36-13.  On May 26, 2010, Ms. Nikkel's check was returned for insufficient funds.  Docket No. 36-14.  Because of the invalid check, Wakefield requested an entry of judgment in the state court action on September 16, 2010, Docket No. 36-15, which the state court granted on October 4, 2010.  Docket No. 36-17.

That same day, Ms. Nikkel commenced this action against Wakefield.  Docket No. 1.  On January 10, 2011, Wakefield moved to dismiss plaintiff's complaint [Docket No. 12], which the Court denied [Docket No. 22].  On March 26, 2012, Wakefield moved for summary judgment seeking an order that (1) Ms. Nikkel's FDCPA claims are barred by the general waiver clause included in the settlement agreement, Docket No.

8

36-11, and (2) that it is entitled to summary judgment with respect to all of plaintiff's FDCPA claims.

## II.   STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & County of Denver,* 36 F.3d 1513, 1517 (10th Cir. 1994); *see also Ross v. The Bd. of Regents of the Univ. of N. M.*, 599 F.3d 1114, 1116 (10th Cir. 2010).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

A defendant may present an affirmative defense in a summary judgment motion which entitles it to a judgment as a matter of law.  *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997).  A defendant making such a motion, however, must demonstrate

that no disputed material fact exists regarding the affirmative defense asserted.  *Id.*;

*Madrid v. Phelps Dodge Corp.*, 211 F. App'x 676, 681 (10th Cir. 2006).

## III.  ANALYSIS

### A.   Waiver

Ms. Nikkel argues that her waiver of the right to bring claims against Wakefield

as reflected in the settlement agreement was neither knowing nor voluntary because

she was unaware of her legal rights, was unrepresented, and did not understand that

the waiver would preclude her from asserting claims pursuant to federal and state

statutes.   Docket No. 37 at 9-10.   In response, Wakefield contends that Ms. Nikkel

knowingly and voluntarily signed the settlement agreement and therefore the waiver

clause bars her FDCPA claim.  Docket No. 36 at 10.

As a general rule, "absent some affirmative indication of Congress' intent to

preclude waiver, [courts] presume[ ] that statutory provisions are subject to waiver by

voluntary agreement of the parties."  *United States v. Mezzanatto*, 513 U.S. 196, 201

(1995).  Plaintiff does not argue that her rights under the FDCPA cannot be waived.

Docket No. 37 at 6-7.  Rather, she claims that the waiver analysis should be based on a

heightened standard of voluntariness.  *Id*. at 8 (citing *Clark v. Capital Credit & Collection

Serv., Inc.*, 460 F.3d 1162, 1170 (9th Cir. 2006)).

In *Clark*, the Ninth Circuit applied the principles of waiver to a claim brought

pursuant to 15 U.S.C. § 1692c(c).  *Id*. at 1170.  The court was presented with the

question of whether a consumer could waive his or her protection under § 1692c(c),

which allows a consumer to notify a debt collector to cease all communications with

respect to the collection of a debt.  *See* 15 U.S.C. § 1692c(c).  The court found that a

consumer could waive his or her right under the cease communication directive in

§ 1692c(c) even though "the plain language of § 1692c(c) [does not] contemplate

waiver."  *Clark*, 460 F.3d at 1169.  The Ninth Circuit reasoned that, "absent some

affirmative indication of Congress' intent to preclude waiver," a consumer could waive

certain protections under the FDCPA without undermining the general purpose and

policy of the statute.  *Id*. at 1170.  The court found that, because nothing in the FDCPA

affirmatively precludes waiver, a waiver is valid so long as it is knowing and voluntary.

*Id*.  However, the court held that it would apply a heightened standard of voluntariness

to such a waiver, meaning that it would enforce a waiver of the FDCPA only where the

least sophisticated debtor would understand that he or she was waiving his or her

rights.  *Id*. at 1171.

Although Ms. Nikkel argues that the Court should apply the heightened

voluntariness standard from *Clark*, the Court declines the invitation to do so.  Both sides

discuss the factors identified in *Torrez v. Pub. Serv. Co. of N.M., Inc*., 908 F.2d 687

(10th Cir. 1990), to determine whether Ms. Nikkel's waiver was knowing and voluntary.

*See, e.g.,* Docket No. 36 at 10-15; Docket No. 37 at 10-11.  The Court finds that those

factors appropriately apply to whether she waived her protections under the FDCPA.  In

*Torrez*, the Tenth Circuit held that employment discrimination claims brought pursuant

to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C.

§ 1981 could be waived pursuant to an agreement.  908 F.2d at 689.  The court,

however, held that such waivers must be knowing and voluntary, which "are not lightly

to be inferred." *Id.* (citing *Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1172 (5th Cir. 1976). In considering whether a waiver of federal rights was knowing and voluntary, the court adopted a totality of the circumstances test assessing the following seven factors: (1) the clarity and specificity of the release language; (2) plaintiff's education and business experience; (3) the amount of time plaintiff had to consider the release before signing it; (4) whether plaintiff knew or should have known her rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiating the terms of the release; and (7) whether the consideration given in exchange for the waiver exceeds the benefits to which the employee was already entitled to by contract or law.[10]  *Id.* at 689-90.  The court also emphasized that whether a waiver was knowing and voluntary was a question of fact.  *Id.*

First, Wakefield argues that the language of the settlement agreement clearly demonstrates a waiver of all claims brought pursuant to the FDCPA.  Docket No. 36 at 10.  Wakefield asserts that there is no genuine issue of fact with respect to the meaning of the settlement agreement because it is written in language that someone with Ms. Nikkel's level of education would be able to read and understand.  *See* Docket No. 36-11 at 1-2, ¶ 4.  The Court agrees.  Because the language in the settlement agreement mentions the FDCPA and Colorado's statutory equivalent, it is more specific than the language at issue in *Torrez*.  908 F.2d at 690.  Based on the clear import of this clause,

---

[10]The Tenth Circuit also considered, though not specifically articulated, whether a plaintiff was subject to undue economic pressure to sign a waiver of its rights.  *Id.* at 690 n.3.

the Court finds that no reasonable juror could conclude that the rights waived by the settlement agreement were unclear or ambiguous.  Thus, this factor weighs in favor of Wakefield and summary judgment.  *Torrez*, 908 F.2d at 690 ("[w]hile evaluation of the language of the contract is necessary to determine the validity of the waiver of discrimination claims, our inquiry cannot end there").

Second, Wakefield contends that, although Ms. Nikkel only has a ninth-grade high school education, her employment with the Food and Drug Administration and her desire to complete the General Educational Development test are sufficient to establish that she understood the terms of the contract.  Docket No. 36 at 10.  In addition, Wakefield claims that, because Ms. Nikkel reached a payment agreement with Apollo Credit Agency, Inc. ("Apollo"), another debt collector, one week prior to May 17, 2010, this shows that she had some experience with settlement agreements.  *Id*. at 11.

It is undisputed that Ms. Nikkel has never taken any college courses, has had no vocational training, does not hold any professional titles, and that she dropped out of high school after the ninth grade.  Docket No. 36-4 at 3 (Nikkel Dep. 26:19-25).  Based on this educational background, the Court finds that Ms. Nikkel's limited educational experience raises a jury question about her ability to understand the scope of her rights under the FDCPA – a statute that she was not aware of – and the legal implications of waiving such rights.  *See Torrez*, 908 F.2d at 690 (finding a plaintiff's confusion about the scope of a waiver clause reasonable "for a high school educated employee, unfamiliar with the law").  Moreover, although Ms. Nikkel read the settlement agreement, the FDCPA was not discussed during the April 22, 2010 phone call.

In addition, the fact that Ms. Nikkel signed a settlement agreement with Apollo is insufficient to show that Ms. Nikkel had experience with settlement negotiations. Usually, when courts discuss whether an individual has "business experience," they refer to the length of time a person has spent in a particular industry and whether, based on his or her employment duties, that person understood the scope of the bargain.  *See, e.g., Rutledge v. Int'l Business Machines Corp.*, 972 F.2d 357, 1992 WL 189105, at *2 (10th Cir. 1992) ("[p]laintiff had twenty-five years of employment experience with Defendant and some post-high school education"); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 (9th Cir. 2007) ("[b]ased on her college-level education and prior work experience with the Tempe PD, Nilsson possessed sufficient education and experience to understand the waiver"); *Bittner v. Blackhawk Brewery & Casino, LLC*, No. 03-cv-02274-MSK-PAC, 2005 WL 1924499, at *3 (D. Colo. Aug. 9, 2005) ("because the Plaintiff held a management position, the Court assumes she had received training or was at least aware of the existence of anti-discrimination laws"). Here, the only evidence in the record is that Ms. Nikkel signed a settlement agreement with Apollo.  There is no evidence about whether the agreement with Apollo was signed after extensive negotiations, the length of time Ms. Nikkel had to consider the Apollo agreement, and whether the Apollo agreement contained a similar waiver of federal rights.  Without this evidence, the Court finds that the Apollo agreement does not support a finding that Ms. Nikkel had significant experience with settlement negotiations.  Thus, this factor favors Ms. Nikkel and also weighs against summary judgment.

Third, Wakefield argues that it did not exert pressure on Ms. Nikkel and that she had approximately nineteen days to consider the settlement. Docket No. 36 at 12. Wakefield argues that it was also willing to provide Ms. Nikkel with additional time to consider the offer, which it claims is evidenced by its acceptance of her late settlement check. *Id.*

As noted above, Ms. Nikkel received the settlement agreement on April 28, 2010 and had to return the agreement to Wakefield by May 14, 2010. Wakefield also contends that it would have granted Ms. Nikkel additional time to deliberate had she requested it, although nothing in the record suggests that it conveyed this fact to her. *Bittner*, 2005 WL1924499, at *4. Thus, based on Ms. Nikkel's knowledge at the time, she had nineteen days to either accept the settlement agreement or face a judgment in the state court action. Although Ms. Nikkel testified that she felt rushed to return the settlement agreement, Docket No. 37-1 at 34 (Nikkel Dep. 316:13-16), the Court finds that nineteen days was a sufficient amount of time for Ms. Nikkel to consider its terms. *See Madrid v. Phelps Dodge Corp.*, 211 F. App'x 676, 682 (10th Cir. 2006) (plaintiff's "testimony clearly showed his understanding that he had time to think over his decision to sign the Release if he wanted to do so"); *Anderson v. Lifeco Servs. Corp.*, 881 F. Supp. 1500, 1504 (D. Colo. 1995) (finding that plaintiff had sufficient time consider the waiver of her rights because she "reviewed the release for eighteen days before executing it"). A consumer with a pending appearance in court will always be subject to a certain amount of pressure about his or her decision to sign  a settlement agreement. Here, however, Ms. Nikkel had a reasonable amount of time to consider her options

15

and review the settlement agreement.  Thus, this factor weighs in favor of Wakefield and summary judgment.

Fourth, Wakefield argues that Ms. Nikkel should have known about the scope of the FDCPA waiver because she had nineteen days to consider the settlement agreement.  Docket No. 36 at 12-13.  In addition, Wakefield argues that, because Ms. Nikkel was unaware of any rights she waived, the Court should instead focus on whether Wakefield "mistreated" her during its collection efforts.  *Id*. at 13.  The Court disagrees.

Under this prong of the analysis, the inquiry typically focuses on a plaintiff's knowledge at the time he or she signed a general release waiver and not about the way the debt collector treated the plaintiff.  *See Torrez*, 908 F.2d at 690 ("[h]e testified he believed he was releasing claims arising out of the voluntary termination and the benefits package he was accepting"); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991) ("we find no issue of material fact remaining on whether Wright should have known he was waiving all his related discrimination claims pending with the [Equal Employment Opportunity Commission] when he endorsed the check").  When focusing on Ms. Nikkel's knowledge, it is clear that she was not aware of the FDCPA or her legal rights under the FDCPA at the time she signed the settlement agreement.  Docket No. 36-4 at 39 (Nikkel Dep. 143:8-10).  In addition, Wakefield's collector did not discuss the waiver clause with Ms. Nikkel.  Docket No. 37-2 at 4 (Rule 30(b)(6) Dep. 110:19-111:3); *id*. at 5 (Rule 30(b)(6) Dep. 111:21-25).  Furthermore, to the extent Wakefield argues that Ms. Nikkel could have requested clarification, the Court finds that whether it was reasonable for Ms. Nikkel to seek clarification raises a jury question.  *Bittner*, 2005 WL

1924499, at *4 n.1 (noting that "courts are much more likely to find a voluntary relinquishment of a right that has already been asserted prior to the release than they are to find a waiver of a right that the employee has not yet asserted and may not even be aware of"); *see Nicholas v. Dep't of Health*, 951 F.2d 1259, 1991 WL 268838, at *4 (10th Cir. Dec. 11, 1991) ("plaintiff obviously knew that she had a right not to be discriminated against based on age").  Thus, the Court finds that this factor weighs against summary judgment.

Wakefield argues that, although it did not advise plaintiff to seek counsel, plaintiff had ample opportunity to seek the advice of counsel.  Docket No. 36 at 13.  In addition, Wakefield points to Ms. Nikkel's current attorneys as evidence that she had the ability to secure representation.  *Id.*

As discussed in *Torrez*, the inquiry under this prong focuses on whether a plaintiff "consulted with an attorney [or] received encouragement from defendant to do so before [s]he signed the release."  *See Torrez*, 908 F.2d at 690; *cf. Myricks v. Fed. Reserve Bank of Atlanta*, 480 F.3d 1036, 1041 (11th Cir. 2007) (noting that "an employee's decision to consult an attorney before signing a clear release creates a presumption that the release is enforceable").  Based on the facts in the record, it is undisputed that Ms. Nikkel was not represented by an attorney, that she never presented the settlement agreement to an attorney, and that Wakefield did not encourage her to seek legal advice about the agreement.  Docket No. 37-1 at 30 (Nikkel Dep. 312:7-21).  The Court finds that this factor weighs in favor of Ms. Nikkel and against summary judgment.

Wakefield next argues that Ms. Nikkel was able to negotiate fair terms with its collection agents as she reduced the required down payment from $500 to $300 and reduced the monthly payments from $300 to $100 per month.  Docket No. 36 at 14. Moreover, Wakefield claims that Ms. Nikkel had every opportunity to discuss alternative payment arrangements, but did not do so because she believed that the agreement was fair.  *Id*.

It is undisputed that Ms. Nikkel understood that her failure to sign the settlement agreement could lead to a judgment against her, garnishment of her wages, and an order to pay court costs.  Docket No. 37-1 at 34 (Nikkel Dep. 316:8-16).  Given plaintiff's ability to negotiate a decrease of her down payment and her monthly payments in the settlement agreement, the Court finds that this evidence demonstrates that Ms. Nikkel had an ability to at least negotiate the monetary terms of the agreement. However, because the waiver clause was not discussed during the phone conversation, there is no indication in the record that Ms. Nikkel had an opportunity to negotiate the waiver clause or the necessary understanding of her FDCPA rights to do so.  *Anderson v. Lifeco Servs. Corp.*, 881 F. Supp. 1500, 1504 (D. Colo. 1995) ("the *Torrez* factors tend to require a subjective analysis of the employee's understanding of the consequences of the release and whether the terms of the release were subject to negotiation").  In light of these facts, the Court finds that whether Ms. Nikkel's conversation with Wakefield's collection agent provided her with a meaningful opportunity to negotiate is a question of fact for the jury.  *Torrez*, 908 F.2d at 690 n.3 (plaintiff's agreement "indicates there may have been duress in the form of unfair economic pressure placed on plaintiff to sign the release").

18

Finally, Wakefield argues that Ms. Nikkel's ability to avoid a judgment and court costs represents sufficient consideration.  Docket No. 36 at 15.  The Court agrees.  Ms. Nikkel does not claim that she was not required to repay the Children's account or that she would not have been subject to court costs had Wakefield proceeded with the state court case.  Thus, because Ms. Nikkel was able to avoid payment of court costs and the inconvenience of judicial proceedings through the settlement, she received something to which she was not already unquestionably entitled.  *Nicholas*, 1991 WL 268838, at *5.  Thus, this factor weighs in favor of Wakefield and summary judgment.

Under the *Torrez* totality of the circumstances test, the factors favoring a determination that Ms. Nikkel knowingly and voluntarily executed the settlement agreement are that the terms of the settlement agreement clearly waived the FDCPA claims, Ms. Nikkel had ample time to deliberate before signing the agreement, and she received compensation in excess of what she was otherwise entitled.  The factors contrary to a finding of voluntariness are that Ms. Nikkel was not experienced with respect to settlement negotiations, had only a ninth-grade education, did not know the scope of her rights under the FDCPA, was not advised to seek counsel, was not represented by counsel, and did not have an opportunity to negotiate the waiver clause.  Based on this evidence, Wakefield does not demonstrate, as a matter of law, that Ms. Nikkel knowingly and voluntarily waived her rights under the FDCPA.  Because there remain genuine questions of fact with regard to whether Ms. Nikkel understood the effect of signing the settlement agreement, the Court finds that it is for the jury to decide the conclusions to be drawn from the facts in this case.  Accordingly, Wakefield is not entitled to summary judgment because of the waiver clause.  *Torrez*, 908 F.2d at 691.

19

## B.   FDCPA Claims

The FDCPA was enacted to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e).  The Act provides a civil cause of action against any debt collector who fails to comply with its requirements.  *See* 15 U.S.C. § 1692k(a).  In addition, the FDCPA does not typically require a plaintiff to prove that a debt collector acted intentionally when it violated the act and, as a result, it is often described by courts as a strict liability statute.  *Johnson v. Riddle*, 305 F.3d 1107, 1122 n. 15 (10th Cir. 2002) (listing cases); *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1190 (11th Cir. 2010).

While the FDCPA forbids a variety of conduct:

> The substantive heart of the FDCPA lies in three broad prohibitions.  First, a "debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt."  § 1692d.  Second, a "debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  § 1692e.  Third, a "debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." § 1692f.

*Riddle*, 305 F.3d at 1117.

In her amended complaint, plaintiff alleges that Wakefield violated 15 U.S.C. §§ 1692f, 1692g(a), 1692f(1), 1692e(2)(a), and 1692e(10) through its attempts to collect the Children's account.  *See* Docket No. 10.  To establish a violation of the

FDCPA, Ms. Nikkel must show that (1) she is a "consumer"[11] within the meaning of 15

U.S.C. § 1692a(3); (2) the Children's account arises out of a transaction entered into

primarily for personal, family, or household purposes, 15 U.S.C. § 1692a(5); (3)

Wakefield is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6); and (4)

Wakefield, through its acts or omissions, violated a provision of the FDCPA.  There is

no dispute that Ms. Nikkel is a consumer, the Children's account qualifies as a debt

under the statute, and Wakefield is a debt collector under the FDCPA.  Thus, to prevail,

Ms. Nikkel need only show that Wakefield violated a provision of the FDCPA.

### 1.   *Least Sophisticated Consumer Standard*

When deciding claims brought pursuant to § 1692e and § 1692f of the FDCPA,

courts have used a "least sophisticated consumer" standard to determine whether a

debt collector's representations were false, deceptive, misleading, unfair, or

unconscionable.  *See Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993) (listing

cases).  The least sophisticated consumer standard ensures protection to all

"consumers, even the naive and the trusting, against deceptive debt collection

practices, and . . . protects debt collectors against liability for bizarre or idiosyncratic

interpretations of collection notices."  *Id*. at 1320.  At least five courts of appeal have

applied the least sophisticated standard to alleged violations of § 1692e and § 1692f.

*See, e.g., LeBlanc*, 601 F.3d at 1194; *Lesher v. Law Offices of Mitchell N. Kay, PC*, 650

F.3d 993, 1002 (3d Cir. 2011); *Hartman v. Great Seneca Fin. Corp.*, 569 F.3d 606, 612

(6th Cir. 2009); *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1033 (9th Cir. 2010);

---

[11]"The term 'consumer' means any natural person obligated or allegedly
obligated to pay any debt."  15 U.S.C. § 1692a(3).

*Evory v. RJM Acquisitions Funding, LLC*, 505 F.3d 769, 774 (7th Cir. 2007) (using the "unsophisticated consumer" standard).  The Tenth Circuit has not expressly adopted this standard, but it has, in an unpublished opinion, "applied an objective standard, measured by how the least sophisticated consumer would interpret the notice received from the debt collector."  *Ferree v. Marianos*, 129 F.3d 130, 1997 WL 687693, at *1 (10th Cir. Nov. 3, 1997) (internal quotation marks omitted).  Accordingly, because the FDCPA is a remedial statute that "should be construed liberally in favor of the consumer," *Riddle*, 305 F.3d at 1117, the Court will apply the least sophisticated consumer standard to Ms. Nikkel's claims brought pursuant to § 1692e and § 1692f.

## 2.  Section 1692f

Section 1692f states that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C. § 1692f.  Ms. Nikkel argues that Wakefield violated § 1692f when it induced her to sign the settlement agreement without (1) advising her of the legal effect of the waiver provision, (2) advising her to seek legal counsel, and (3) discussing the inclusion of an attorneys' fees provision.  Docket No. 37 at 13.  Ms. Nikkel argues that Wakefield's actions in securing the settlement agreement create a triable issue of fact for the jury.  *Id*.

In response, Wakefield contends that obtaining a general release of legal claims does not constitute a *per se* violation of the FDCPA.  Docket No. 36 at 16-17.  Wakefield states that it does not argue that "there are no circumstances in which the procurement of a release of claims relating to debt collection activity could violate the FDCPA," but that such circumstances are not present in this case because Ms. Nikkel

thought the settlement agreement was fair until she contacted an attorney and the

settlement agreement does not otherwise contain inaccuracies.  *Id*. at 17-18.

With respect to the "unfair or unconscionable" language contained in § 1692f,

courts have recognized that "[a]side from the examples of violations provided within

Section 1692f, the FDCPA does not purport to define what is meant by 'unfair' or

'unconscionable.'"  *LeBlanc*, 601 F.3d at 1200.  The Seventh Circuit described the

amorphous nature of § 1692f when it stated that "the phrase 'unfair or unconscionable'

is as vague as they come."  *Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480

F.3d 470, 474 (7th Cir. 2007).  The test of whether a means of collection is

unconscionable depends not on the particular plaintiff's knowledge, but upon how the

least sophisticated consumer would perceive a debt collector's actions.  *Turner v.*

*J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 996 (7th Cir. 2003); *see also McCollough v.*

*Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 952 (9th Cir. 2011) ("The FDCPA

measures a debt collector's behavior according to an objective 'least sophisticated

debtor' standard.").  Thus, Wakefield's arguments based on Ms. Nikkel's actual

perception of its actions are largely irrelevant to the inquiry and instead the Court must

apply an "objective standard."  *Ferree*, 1997 WL 687693, at *1.

While collection agencies may enter into settlement agreements with indebted

consumers, the FDCPA requires that debt collectors do so in a manner that is not unfair

or unconscionable.  *See Goswami v. Am. Collections Enter., Inc.*, 377 F.3d 488, 495-96

(5th Cir. 2004) (discussing settlement offers in connection with the FDCPA).  Ms. Nikkel

does not contend that Wakefield's cover letter, which provided information with respect

to settlement, constitutes an unfair or unconscionable means of settlement.  Rather, she claims that it was unfair or unconscionable to send an unsophisticated consumer like her a settlement agreement two weeks before her initial appearance in state court proceedings without advising her to retain an attorney and without discussing her FDCPA rights, particularly given that the settlement agreement contained a waiver of her legal claims against Wakefield and an attorneys' fees provision.

Based on these facts, the Court cannot say that, as a matter of law, Wakefield's conduct in this case was not unfair or unconscionable.  *See Turner*, 330 F.3d at 999 (question of violation of 1692e was for jury, but violation of 1692f can be for courts as a matter of law).  Although there may be cases where the parties do not dispute allegedly deceptive, unfair, or unconscionable conduct, in which event the court may determine as a matter of law whether the undisputed conduct amounts to a violation of the FDCPA, this is not such a case.  Instead, the Court finds that whether Wakefield's settlement agreement in this instance constitutes unfair or unconscionable conduct for purposes of § 1692f presents a jury question.  *LeBlanc*, 601 F.3d at 1201.  Thus, because genuine issues of fact remain in this case, the Court will deny Wakefield's motion for summary judgment on plaintiff's § 1692f claim.  *See Evory,* 505 F.3d at 776 (noting that whether settlement offer violates FDCPA's unconscionable means provisions is generally a question of fact and that simply because the offer is not deceptive on its face does not, by itself, render the offer lawful); *but see Waters v. Kream*, 770 F. Supp. 2d 434, 437-38 (D. Mass. 2011) (finding that a debt collector sending a letter, which suggested that consumer make arrangements with debt

collector's office for settlement so that additional court costs may be avoided by consumer, is not unconscionable conduct under § 1692f).

### 3. Section 1692g(a)

Section 1692g(a) requires that a debt collector "[w]ithin five days after the initial communication with a consumer . . . send the consumer a written notice" containing specified information unless that information was already included in the initial communication.  15 U.S.C. § 1692g(a).[12]  The initial communication must include the

_____

[12]Section 1692g(a) provides:

Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing --

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

15 U.S.C. § 1692g(a).

name of the creditor, the dollar amount sought, and alert the consumer that a failure to dispute the alleged debt will allow the collection agency to assume its validity.  *Id*.

Ms. Nikkel first argues that the "initial communication" she received from Wakefield was the "cover letter" attached to the state court summons.  Docket No. 37 at 18.  She claims that, after this initial communication, Wakefield failed to provide her with the necessary disclosures as required by the FDCPA.  *Id*.  Second, Ms. Nikkel contends that, even assuming Wakefield sent an Initial Demand Letter on March 17, 2009, this letter failed to satisfy the requirements of the FDCPA because she did not live at the Wheat Ridge address on March 17, 2009 and therefore the letter was not "properly" sent.  *Id*.  Ms. Nikkel asserts that, for an Initial Demand Letter to be properly sent, a debt collector must send "written notice to a valid and proper address where the consumer may actually receive it."  *Id*. at 16 (citation omitted).  Third, Ms. Nikkel claims that, because Wakefield has not produced a copy of the March 17, 2009 letter or a sample copy of letters it typically sends to consumers, it cannot prove that the contents of the March 17, 2009 letter complied with the FDCPA.  *Id*. at 17.

Wakefield responds that § 1692g(a) does not require that a debt collector establish whether a consumer actually received a Validation of Debt Notice, Docket No. 36 at 18, but rather that a debt collector is presumed to have complied with § 1692g(a) so long as the notice that is mailed is not returned as undeliverable.  *Id*. at 19.  Thus, Wakefield argues, because it sent the letter on March 17, 2009 to the address listed for Ms. Nikkel both on Children's billing statement and identified by Accurant, it has met its obligations under § 1692g(a).  *Id*.

Based on the evidence in the record, the Court finds that Wakefield has not established that it sent Ms. Nikkel an Initial Demand Letter compliant with § 1692g(a) on March 17, 2009.  In order for Wakefield to satisfy § 1692g(a), it must not only show that it sent Ms. Nikkel an Initial Demand Letter, but that such letter actually contained the necessary disclosures listed in § 1692g(a).  It has failed to show both.

Wakefield relies primarily on *Mahon v. Credit Bureau of Placer Cnty.*, 171 F.3d 1197, 1201 (9th Cir. 1999), a case which held that a debt collector satisfies its obligation under § 1692g(a) if it can show that it "sent" the required notice.  *Id.* at 1201.  Relying on the text of § 1692g(a), the *Mahon* court found that the statute does not require that a debt collector guarantee a consumer actually receive a Validation of Debt Notice to satisfy its obligation.  *Id.*  Instead, the *Mahon* court found that the plain language states that such a Notice need only be sent to a debtor.  *Id.*

Ms. Nikkel relies on *Johnson v. Midland Credit Mgmt., Inc.*, 2006 WL 2473004 (N.D. Ohio Aug. 24, 2006), where the court found that, although § 1692 does not require the debt collector to ensure actual receipt of the validation notice, if a debt collector knows the validation notice was sent to the wrong address, the debt collector has not complied with the plain language of § 1692g(a).  *Id.*  The *Johnson* court found that, if debt collectors could satisfy the FDCPA by sending validation notices to any address, valid or invalid, the statute would not serve to inform consumers of their rights.  *Id.*  The Court need not resolve which interpretation of § 1692g(a) to apply because Wakefield has not established that it sent Ms. Nikkel a letter on March 17, 2009.

As noted above, Wakefield does not send Initial Demand Letters, but instead relies on DANTOM, its third party vendor, to send the letters.  Wakefield's motion for summary judgment, however, does not contain any evidence of the procedures and policies used by DANTOM to ensure that letters created by the Cyclone software are actually sent to the correct addresses.  Instead, Wakefield relies on testimony by Mr. Boettcher.  However, Mr. Boettcher has no personal knowledge of the policies in place at DANTOM for mailing Initial Demand Letters.  *Compare Boomer v. AT&T Corp.*, 309 F.3d 404, 415 n.5 (7th Cir. 2002) ("In this case, AT&T presented proof through the Declaration of Ellen Reid, the AT&T employee who oversaw the mailing of the [consumer service agreement] to AT&T customers, verifying that proper mailing procedures were followed. Boomer does not present any conflicting evidence in this regard.  Thus, we must presume that Boomer received the mailing.").  Mr. Boettcher does not state that the proper procedures were followed in the DANTOM office for mailing Ms. Nikkel's letter on March 17, 2009 and does not show that this letter was generated using an appropriate template.  *See Godfrey v. United States*, 997 F.2d 335, 338 (7th Cir. 1993) (a presumption exists that a mailing is received where there is "proof of procedures followed in the regular course of operations which give rise to a strong inference that the [correspondence] was properly addressed and mailed").

In fact, apart from Mr. Boettcher's testimony about the Cyclone software, there is no evidence in the record from DANTOM, the only entity with personal knowledge of whether Ms. Nikkel's letter was sent on March 17, 2009.[13]  *See Anderson v. Credit*

---

[13]The procedures in *Mahon* differ significantly from those used by Wakefield in this case.  In *Mahon*, the Credit Bureau's computer system generated the notice, and

*Bureau Collection Servs.*, 422 F. App'x 534, 538 (7th Cir. 2011) (finding affidavit from company director about procedures of third-party vendor were inadmissible hearsay because director was not custodian of the records, had no personal knowledge of third-party vendor procedures, and did not have knowledge of whether these procedures were followed in the particular instance).

Additionally, Wakefield does not provide evidence that the contents of the March 17, 2009 letter complied with § 1692g(a).  In order to show that its letter complied with the requirements of § 1692g(a), Wakefield must prove the contents of that letter. However, Wakefield has provided neither the original letter, a copy of such letter, or a sample letter from which the March 17, 2009 letter was produced.  Accordingly, the Court finds that Wakefield is not entitled to summary judgment on Ms. Nikkel's § 1692g(a) claim.

### 4.  *Section 1692f(1)*

Section 1692f(1) prohibits "unfair or unconscionable means to collect or attempt to collect any debt . . . [consisting of t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by

---

then another machine mechanically addressed and stuffed the notice into an envelope. 171 F.3d at 1201-02.  The notice was then mailed, but before mailing, Credit Bureau employees ensured that the number of outgoing notices corresponded with the number assigned to the daily "batch" of notices to be sent.  *Id*.  Here, Wakefield does not mail the letters and there is no indication from the third party vendor whether they check the letters prior to mailing to ensure the information is correct.  Mr. Boettcher cannot testify as to these procedures because he does not have personal knowledge of them.

law."  15 U.S.C. § 1692f(1); *Maynard v. Cannon*, 401 F. App'x 389, 397-98 (10th Cir.

2010).

Ms. Nikkel argues that Wakefield violated § 1692f(1) when it advised her that

she had to pay eight percent interest on the Children's account during the April 22,

2010 phone conversation.  Docket No. 37 at 19.  Ms. Nikkel claims that, because

Wakefield has not provided the instrument creating her debt, it has not conclusively

established that the eight percent interest attributed to the Children's account was

permitted by law.  *Id*.  Ms. Nikkel states that, under Colorado law, if the agreement

creating the debt specifies an interest rate, debt collectors cannot apply the statutory

default rate of eight percent to that debt.  Docket No. 37 at 19.

Wakefield responds that, because Colorado's statutory default rate of eight

percent per annum is permissible by law, it has not violated § 1692f(1).[14]  Docket No. 36

at 20.  Moreover, Wakefield asserts that the state court judgment affirms the legality of

the eight percent interest rate.  Docket No. 38 at 10.

Neither party disputes that the conversation between Ms. Nikkel and collection

agent JB on April 22, 2010 constitutes a "communication"[15] as that term is defined

────────────────────

[14]To the extent Wakefield claims that this interest rate was applied based on the advice of counsel, the Court finds this unavailing.  *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, --- U.S. ----, 130 S.Ct. 1605, 1608-09 (2010) (that a mistake of law is not a defense under the FDCPA, that is, a violation of the FDCPA resulting from a debt collector's incorrect interpretation of the legal requirements of the Act is not subject to an excuse); *Clark v. Capital Credit Collection Servs., Inc.*, 460 F.3d 1162, 1176 (9th Cir. 2006) (finding that the FDCPA makes debt collectors liable for violations that are not knowing or intentional).

[15]A "communication" constitutes "conveying of information regarding a debt directly or indirectly to any person through any medium."  15 U.S.C. § 1692a(2).

under § 1692f(1).[16]  To evaluate whether Wakefield's collection attempt was "permitted

by law," it is necessary to determine by which "law" it was permitted.  *Riddle,* 305 F.3d

at 1117-18.  In other words, the Court must determine whether state substantive law

permitted Wakefield to apply an eight percent interest rate to Ms. Nikkel's Children's

account.  *Riddle*, 305 F.3d at 1118.

Colo. Rev. Stat. § 5-12-101, entitled "Legal rate of interest," provides that "[i]f

there is no agreement or provision of law for a different rate, the interest on money shall

be at the rate of eight percent per annum, compounded annually."  Colo. Rev. Stat. § 5-

12-101.  Thus, under Colorado law, "[w]hen the instrument being sued upon provides

for prejudgment interest at a specific rate, section 5-12-101(1) does not apply, and the

clear implication is that prejudgment interest will be awarded at the rate specified in the

contract."  *Westamerica Mortg. Co. v. First Nationwide Bank*, No. 86-cv-01901-AAA,

1988 WL 76377, at *7 (D. Colo. July 15, 1988).  Moreover, where such instrument

provides for a rate of interest in excess of eight percent, prejudgment interest will be

awarded at the higher rate.  Colo. Rev. Stat. § 5-12-103(1).  By contrast, creditors

recovering prejudgment interest after a judgment has entered in a case do so pursuant

to Colo. Rev. Stat. § 5-12-102.  Here, it is undisputed that, on April 22, 2010, Wakefield

had not yet secured a judgment on the Children's account and therefore Colo. Rev.

Stat. § 5-12-102 is inapplicable.  *See Mesa Sand & Gravel Co. v. Landfill, Inc.*, 776

P.2d 362, 363-64 (Colo. 1989) ("The purpose of section 5-12-102 is to discourage a

---

[16]  Although § 1692f(1) mentions only the term "collection" and not "attempt to
collect," courts have found that § 1692f(1) protects consumers from attempted
collections as well as actual collections.  *Allen v. LaSalle Bank, N.A.*, 629 F.3d 364, 367
n.4 (3d Cir. 2011).

person responsible for payment of a claim to stall and delay payment until judgment or settlement") (citation omitted).  Thus, the issue here is whether the debt obligation between Ms. Nikkel and Children's provided an interest rate other than eight percent. *Riddle*, 305 F.3d at 1118 ("The statute does not ask whether *Riddle's actions* were permitted by law (or at least non-sanctionable), it asks whether the *amount* he sought to collect was permitted by law").

Because Wakefield has not presented the "agreement creating the debt," the Court is unable to determine whether an interest rate other than eight percent is applicable.  Therefore, Wakefield has not provided sufficient evidence to prove that, on April 22, 2010, it was entitled to collect an interest rate of eight percent on the Children's account.  Moreover, to the extent Wakefield argues that the judgment in state court bars Ms. Nikkel from raising a § 1692f(1) claim, Docket No. 38 at 10, the Court finds this argument unpersuasive for the reasons identified in its order on the motion to dismiss.  *See* Docket No. 22 at 6-10.

Accordingly, without evidence of the interest rate specified on the Children's account, Wakefield is not entitled to summary judgment on Ms. Nikkel's § 1692f(1) claim.  *See Gigli v. Palisades Collection, LLC*, 2008 WL 3853295, at *8 (M.D. Pa. August 14, 2008) (declining defendant's motion for summary judgment because of inconsistent testimony regarding how the interest rate was determined and the defendant refused to produce the original agreement).

### 5.   Section 1692e(2)(A)

Section 1692e(2)(A) reads, in relevant part: "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt . . . the following conduct is a violation of this section: (2) The false representation of . . . (a) the character, amount, or legal status of any debt."  15 U.S.C. § 1692e(2)(A).  Ms. Nikkel claims that Wakefield misrepresented the amount owed by demanding payment of accrued interest not expressly authorized by her debt with Children's.  If the interest rate provided for by the Children's account specifies an interest rate that is not eight percent, then Wakefield's communication with Ms. Nikkel on April 22, 2010 would have falsely represented the amounts Wakefield could lawfully collect in violation of § 1692e(2)(A).  *Ditty v. CheckRite, Ltd., Inc.*, 973 F. Supp. 1320 (D. Utah 1997); *Terech v. First Resolution Mgmt. Corp.*, 854 F. Supp. 2d 537, 544 (N.D. Ill. 2012) ("the Court finds that the allegation that Defendants misrepresented their legal entitlement to collect waived interest, which would necessarily then misrepresent the amount of debt, states a claim under § 1692e").  Accordingly, the Court finds that there remain genuine issues of fact and Wakefield is not entitled to summary judgment on plaintiff's § 1692e(2)(A) claim.  *See Sparks v. Phillips & Cohen Assocs., Ltd.*, 641 F. Supp. 2d 1234, 1248 (S.D. Ala. 2008) (explaining that the "gist of § 1692e is that 'where some aspect of a debt collector's communication-whether explicit or implied-has the purpose or effect of making a debtor more likely to respond, the FDCPA requires that it be true.'").

### 6.   Section 1692e(10)

Section 1692e(10) provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt," including specifically "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(10). In determining whether the defendant's actions are deceptive under the FDCPA, courts must assume that the plaintiff-debtor is neither shrewd nor experienced in dealing with creditors. *Goswami*, 377 F.3d at 495. This standard serves the purpose of protecting all consumers, "including the inexperienced, the untrained and the credulous, from deceptive debt collection practices." *Id*. At the same time, however, courts do not consider the debtor as tied to the "very last rung on the [intelligence or] sophistication ladder." *Id*.

Ms. Nikkel asserts the same facts in support of this claim as those above, namely, Wakefield's failure to discuss the waiver clause and its attempt to collect interest, claiming that they constitute deceptive and misleading collection practices. Docket No. 37 at 20. However, none of the statements Wakefield made to Ms. Nikkel were false. First, the cover letter did not include any false statements and Ms. Nikkel testified that her willingness to negotiate was due primarily to her desire to avoid garnishment. *Kream*, 770 F. Supp. 2d at 437. Moreover, the settlement agreement did not use complex legal terms and was written in a manner that a person with a ninth-grade education could read and understand. *Beler*, 480 F.3d at 473. Furthermore,

34

even the least sophisticated consumer would understand that Wakefield sought only to collect on the amount due under the debt. *Kream*, 770 F. Supp. 2d at 438.

To the extent Ms. Nikkel argues that the inclusion of the waiver clause or the attorneys' fees provision was misleading or deceptive, the Court finds this argument unconvincing. There is no indication in the record that the waiver clause or the attorneys' fees provision played any role in Ms. Nikkel's decision of whether to accept or reject the settlement agreement. *O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938, 942 (7th Cir. 2011) (noting that, to be actionable under § 1692e(10), a debt collector's misleading statement must have the ability to influence a consumer's decision). In fact, because Ms. Nikkel's primary objective in reaching a settlement agreement was to avoid garnishment, it is likely that the waiver and attorneys' fees provision played little or no role in her decisionmaking. Thus, the waiver and attorneys' fees provisions were not means used in connection with collecting the debt because they were never discussed by Ms. Nikkel or Wakefield's collector. *See Rogers v. Capital One Servs., LLC*, 447 F. App'x 246, 248 (2d Cir. 2011) (consumer failed to state claim under § 1692e(10) where debt collector's letter used attractive repayment terms to "lure" consumers into negotiations with seasoned debt collectors, but did not allege that repayment offer was not as represented). Accordingly, the Court finds that Ms. Nikkel has not raised a genuine issue of fact that Wakefield violated § 1692e(10) and Wakefield is entitled to summary judgment on this claim.

## IV.  CONCLUSION

Accordingly, it is

**ORDERED** that Defendant Wakefield & Associates, Inc.'s Motion for Summary

Judgment Pursuant to Fed. R. Civ. P. 56 [Docket No. 36] is **DENIED** in part and

**GRANTED** in part.

DATED November 15, 2012.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge